## IN THE OREGON TAX COURT

Arthur D. GUGLER,
Tex Yukl, Fred L. Fuge, Doug Reinecke,
Laurance W. La Kamp, Charles T. Rich,
Ida I. Taylor, Ralph M. Anderson,
Richard J. Taylor, Henry F. Stiltz,
Aldyth Logan, Marjorie Stiltz, Letha Granfors
and E. Lois Julian

*v.*

## BAKER SCHOOL DISTRICT 5-J

(TC 3132)

Arthur D. Gugler appeared on behalf of the plaintiffs.

Martin J. Leuenberger, Coughlin, Leuenberger & Moon P.C., Baker City, represented defendant.

Decision for defendant rendered March 20, 1992.

### CARL N. BYERS, Judge.

Plaintiffs are interested taxpayers who claim that defendant's budget and tax levy for the 1991-92 fiscal year were not prepared and made in substantial compliance with Oregon Local Budget Law (ORS 294.305-.565).[1] If such is the fact, this court may modify the levy or declare it void. ORS 294.485(3). Plaintiffs' complaint raises three basic issues. The court will address each issue separately.

## BUDGET RESOURCES

Plaintiffs claim defendant's budget violated ORS 294.361(1)[2] in that it did not show a resource of $722,017.[3] Defendant argues that the budget law requirements are satisfied by its adoption of a supplemental budget.

This claim pertains to the proper treatment of resources in a special revenue fund known as "Fire Fund No. 2." A fire in 1989 destroyed Baker High School. Fire Fund No. 2 was established to receive the insurance proceeds from that fire and finance reconstruction of the school. The adopted budget for Fire Fund No. 2 in fiscal year 1990-91 was $6,424,809.

It appears that when defendant prepared its 1991-92 budget, it expected all but $50,000 of the $6,424,809 from the prior year would be spent. Thus, the proposed and approved 1991-92 budget showed only a $50,000 "operating transfer" in Fire Fund No. 2. However, delays in reconstruction of the high school and problems with the contractor resulted in some of the construction and

---

[1] All references to Oregon Revised Statutes, unless otherwise noted, are to the 1989 Replacement Part.

[2] ORS 294.361(1) provides:

"Each municipal corporation shall estimate in detail in its budget resources for the ensuing year by funds and sources."

[3] Plaintiffs' complaint alleges an amount of $220,175. However, at the conclusion of trial, the court granted plaintiffs' motion to amend the amount to $722,017.

payments being carried over past June 30, 1991. By June 27, 1991, defendant was aware that $722,017 remained in the fund. Of that amount, only $506,842 was needed to complete the high school, leaving $220,175 uncommitted in the fire fund. Nevertheless, on that date the school board (board) adopted a budget showing a resource of only $50,000 in the fire fund. At the same meeting, the school board directed the superintendent to prepare a supplemental budget. The supplemental budget, later adopted, appropriated $506,842 to finish the high school and $220,175 as "available funds."

In discussing plaintiffs' claims, it will be helpful to review the budgeting process. The budget officer prepares a *proposed* budget. The proposed budget is submitted to a budget committee composed of members of the governing body of the municipal corporation and an equal number of voters. The budget committee considers the proposed budget. After an advertised public meeting, the committee makes whatever changes it determines should be made and approves the budget. The *approved* budget is then submitted to the governing body (in this case, the school board). The board considers the approved budget at another advertised public meeting. At this point, the board can make only limited changes without republication and an additional public hearing. After making the changes it deems appropriate, the board then adopts the budget. The *adopted* budget is the financial framework for the operation of the municipal corporation.

The Department of Revenue (department) is charged by the legislature with the duty of construing the budget laws and making such rules and regulations as it deems necessary. It has published a budget manual to assist municipal corporations in complying with the law. That manual indicates that a governing body should not adopt a budget until the latter part of June "so last minute revisions to revenue or expenditure estimates can be incorporated." Budget Manual for Municipal Corporations 8 (Oregon Department of Revenue) (1989). On the other hand, a municipal corporation *must* adopt a budget before the start of the fiscal year, July 1. The budget laws prohibit any expenditure in a fiscal year without an adopted budget being in place. ORS 294.326(1).

It is not clear at what point in time plaintiffs contend that defendant's budget should have shown a resource of $722,017. Plaintiffs' basic argument is that if the resource had been shown, the voters might have rejected the tax levy of $659,504 which was outside the tax base. Since the budget was not adopted by the board until after the election, plaintiffs must believe it should have been shown in either the proposed or approved budget. However, neither party produced any specific evidence as to when the negotiations with the contractor broke down nor when the conditions arose that prevented completion of the high school within the 1990-91 fiscal year. Consequently, there is no basis for the court to determine if defendant even knew of the necessity of carrying over funds until June 27, 1991.

■ Plaintiffs would impose a rigidity on the budgeting process that is not contemplated by the law. They demand that defendant show resources left over from the current year in the next year's budget long before the current year is over and while the expenditures are still being made. Neither life nor the law is that exact.

"Budgeting isn't simply something a municipal corporation does once a year. It is a continuous process taking 12 months to complete a cycle." Budget Manual for Municipal Corporations 7 (Oregon Department of Revenue) (1989).

Under the general command of ORS 294.361(1), if defendant knew during the budgeting process that the $772,017 would be carried over, it should have shown it as a resource. However, if it was discovered late in the budgeting process, it would be impractical to do so because ORS 294.435(1) provides:

"After the public hearing provided for in ORS 294.430(1) has been held, the governing body shall enact the proper ordinances or resolutions to adopt the budget, to make the appropriations and to determine, make and declare the ad valorem tax levy for each fund. Consideration shall be given to matters discussed at the public hearing. The budget estimates and proposed tax levy of any fund as shown in the budget document may be amended prior to adoption. *However, the amount of estimated expenditures for each fund shall not be increased by more than 10 percent thereof,* and the amount of the total ad valorem taxes to be certified by the

municipal corporation for levy for all funds shall not exceed the amount shown in the budget document as published in accordance with ORS 294.421, prior to the budget meeting, *unless the amended budget document is republished as provided by ORS 294.416 or 294.418 and 294.421 for the original budget and another public hearing is held as provided by ORS 294.430(1)."* (Emphasis added.)

█    Although there is no evidence as to when defendant first determined that a large sum would have to be carried over, it is clear that it knew by June 27, 1991. That was the date the board adopted the budget and instructed the superintendent to prepare a supplemental budget. The board could not have, at that point, simply amended the budget to show the $722,017, because it would have increased the estimated expenditures for Fire Fund No. 2 greater than 10 percent. When the board amends the budget and increases the expenditures more than 10 percent, it must republish the budget and hold another public hearing. Since those procedures require at least 15 days, that would have left defendant without an adopted budget at the beginning of the new fiscal year. That result is not tolerable because it prevents the expenditure of any funds until there is a budget in place.

Was defendant authorized to use a supplemental budget in this situation? ORS 294.480(1) provides in part:

*"Notwithstanding requirements as to estimates of and limitation on expenditures,* any municipal corporation may make a supplemental budget for the fiscal year for which the regular budget has been *prepared* under one or more of the following circumstances:

"(a)   An occurrence or condition which had not been ascertained at the time of the *preparation* of a budget for the current year which requires a change in financial planning." (Emphasis added.)

"Current year" means the fiscal year in progress. ORS 294.305(8).

In applying the statute, the first question is: Was there an "occurrence or condition which had not been ascertained" when the 1991-92 regular budget was "prepared"? As indicated above, the answer to that question is unknown since there is no evidence as to the specific dates of the

problems with the contractor and the construction.[4] Plaintiffs have the burden of proof. In the absence of evidence to the contrary, the court finds that the conditions did occur after the regular budget was prepared.

The second condition is that the supplemental budget be prepared for the fiscal year for which "the regular budget has been prepared." Since the regular budget for 1991-92 was adopted on June 27, 1991, it must have been "prepared" before that time. The supplemental budget was in all likelihood prepared during the 1991-92 fiscal year.[5] Based on these facts, the court finds that defendant was entitled to use the supplemental budget procedures.

In summary, the supplemental budget was prepared for the 1991-92 year. A condition had arisen which had not been anticipated when the 1991-92 budget was prepared; therefore, defendant was entitled to use the supplemental budget procedure. That procedure requires publication of the proposed supplemental budget and a public hearing be conducted. Thus, the public is afforded an opportunity to give its input and express its views as to the proposed changes in expenditures or resources. The supplemental budget procedure further protects the public by providing that the governing body cannot increase the levy of taxes regardless of the changes in the budget.

## CONTINGENCY FUND

Plaintiffs complain that the general contingency amount of $273,488 was unreasonable, was not based on past experiences, and was not based upon the operation and purpose of the particular fund involved. *See* OAR 150-294.352(8).

In requiring municipal corporations to prepare estimates of expenditures for the ensuing year in detail, the Local Budget Law allows a corporation to include in each fund "an

---

[4] The statute uses the term "prepared." If that term is construed to mean the proposed budget prepared by the budget officer, it reaches early into the budgeting process.

[5] The minutes of the board meeting held June 27, 1991, indicate that the board instructed the superintendent "to prepare a supplemental budget." In view of the fact that June 27, 1991 was a Thursday, it seems unlikely that the supplemental budget was prepared before July 1, 1991.

estimate for general operating contingencies.'' ORS 294.352(8). The statute provides no further guidance with regard to the amount or purpose of general operating contingencies. However, the Department of Revenue has adopted OAR 150-294.352(8), which provides in part:

> "The estimate for general operating contingencies is based on the assumption that in the operation of any municipality from an operating fund, certain expenditures will become necessary which cannot be foreseen and planned in the budget because of the occurrence of some unusual or extraordinary event. The estimate shall be reasonable, shall be based on past experiences, and shall be based on the operation and purpose of the particular fund involved.

> "The estimate for general operating contingencies shall not be made in place of an estimate for miscellaneous expenditures. Miscellaneous expenditures are those which are known to be necessary and can be anticipated but which are too small in amount to list separately. The estimate for general operating contingencies must not be used to cover up improper or poor estimating practices in the preparation of the budget. This estimate shall not be used to provide a means for expending funds for those items which, if printed in the budget, would bring criticism upon the budget committee and governing body of the municipal corporation."

Both parties submitted evidence with regard to the amounts and circumstances for contingencies. Howard Britton, a member of defendant's board, was asked by plaintiffs what unusual conditions justified a large increase in the contingency amount. Mr. Britton explained that prior to 1988 or 1989 those involved in preparing and approving the budget had estimated line item expenses assuming a "worst case scenario." This approach to budgeting resulted in money remaining at the end of the year. The amounts remaining were scattered throughout the budget and difficult to locate and administer.

In 1988-89, defendant took a new approach and began estimating line item expenses more realistically and budgeted all estimated contingencies in one line item. Mr. Britton testified concerning the audit reports for the fiscal years 1985-86 through 1989-90. These reports apparently show the unexpended contingency amounts at the end of the fiscal year. Mr. Britton testified those amounts were:

| | |
|---|---|
| 1985-1986 | $117,579 |
| 1986-1987 | $ 92,110 |
| 1987-1988 | $125,000 |
| 1988-1989 | $125,000 |
| 1989-1990 | $224,105 |

The amount budgeted for contingency for 1990-91 was $57,082, while the amount budgeted for 1991-92 was $273,488. None of the contingency for 1990-91 had been used as of March 31, 1991, and none for 1991-92 as of December 31, 1991.

However, Randell Guyer, Jr., a past board member and CPA experienced in municipal audits, explained that just because the audits showed a remaining amount does *not* indicate no moneys were used for contingencies. Money is not spent out of the contingency line item. It is transferred to other funds, or to the appropriate line item within the general fund, and expended from there. The audits show only the amount remaining, not the amounts transferred.[6] Mr. Guyer, who is credited for the improvements in defendant's budgeting process, testified that for 1989-90, the budget committee approved a contingency amount of $250,000. However, the board increased that amount to $309,954. Since the audit report showed a contingency amount of $224,105 at the end of the year, it is reasonable to infer that $85,849 was transferred and used for contingencies in other line items.

Mr. Guyer further testified that in preparing the 1990-91 budget the budget committee approved a contingency amount of $202,741. The board adopted the budget with a contingency amount of $157,082. However, that year defendant lost a levy election and fell into the safety net. Mr. Guyer testified that the board then reduced the contingency amount to $57,082. This allowed $100,000 to be used for other regular budget needs.

Based on his experience with municipal audits as a CPA and also as a past board member, Mr. Guyer expressed his opinion that a contingency of $300,000 in a budget of $9,000,000 was not too much. He further expressed the

---

[6] Neither party introduced a copy of the audit reports and the court is thus handicapped in determining some of the questions surrounding this issue.

opinion that it should be more in the neighborhood of $500,000. Defendant's superintendent, Mr. Holmberg, testified that a rule of thumb for contingencies was one month's payroll. One month's payroll for 1991-92 was approximately $550,000.

■　　　However, the Oregon Administrative Rule does not use a rule-of-thumb test. Further, the superintendent's view was that the contingency appropriation has two purposes: to provide working capital and to cover unanticipated needs. Contrary to the superintendent's impression, the contingency appropriation is not a working capital item. Working capital should be shown as unappropriated ending fund balances.

> "The unappropriated ending fund balance provides a municipal corporation with working capital or cash balance to finance activities between July 1 and when sufficient revenues become available in the fiscal year." Budget Manual for Municipal Corporations 37 (Oregon Department of Revenue) (1989).

The unappropriated ending fund balance cannot be spent and becomes a resource for the next fiscal year.

The only other individual to testify about contingency appropriations was Walter Koscher, an employee of the Oregon Department of Education. He testified the statewide average contingency appropriation is 3.4 percent. Assuming a $9,000,000 budget, under that average, the contingency would be $306,000.

■　　　The department's administrative rule does not provide a standard for determining what is "reasonable." If the court looks at what other school districts are using, defendant is below the average. The rule indicates it should be based on "past experiences." However, history alone is hardly a precursor of the future. While some needs may be predictable based on historical cycles, such as variations in the weather and economic conditions, others are not. For example, the letter dated July 24, 1991, to the board, supporting the supplemental budget, points out that the heating, ventilation and air conditioning systems are all over 35 years old. That letter lists unanticipated repairs in the amount of $64,774 incurred between July 1, 1989, and July, 1991. The statutes

should "not be read so narrowly as to permit contingency funds based only upon past expenditures." *Gugler v. Baker County Educ. Serv. Dist. (Gugler I)*, 305 Or 548, 561, 754 P2d 891 (1988) (quoting *Gugler v. Baker County Educ. Serv. Dist.*, 10 OTR 315, 326 (1986)).

The administrative rule also indicates a contingency amount must consider the "purpose of the particular fund involved." OAR 150-294.352(8). The fund involved is the general fund. Certainly defendant's board must consider the size and nature of expenditures of the general fund in setting the amount of contingency. In this context, it appears the administrative rule provides guidance to the governing body but should not be used as a strict limitation.

The court is reluctant to substitute its judgment for that of defendant's board. The board undoubtedly is aware of potential problems and needs for defendant's operations and plant, of which the court is totally unaware. Moreover, the board is elected by local voters and is charged by the voters with the responsibility of overseeing defendant's operation. If local voters disagree with the judgments of its elected board, they can use the ballot box. However, if the court makes a decision with which the voters disagree, they are handicapped because the Tax Court judge is elected on a statewide basis.

Based on the evidence submitted, the court cannot say that a contingency of $273,488 is unreasonable. The amount is a smaller percentage than the statewide average. If it is not used, it becomes a resource for the next fiscal year. Since contingency appropriations can only be transferred by resolution of the board, plaintiffs appear to be concerned that the board will expend some or all of these funds in a manner with which plaintiffs disagree. As noted before, disagreement with the judgment of elected officials is best resolved by the elective process, not by litigation.

## BALLOT TITLE

Plaintiffs' amended complaint alleges violations of ORS 310.315 in several particulars.[7] Defendant disputes the jurisdiction of the court with regard to these violations and

---

[7] Plaintiffs err in describing this law in their amended complaint as Oregon's Corrupt Practices Act.

claims that jurisdiction lies with the circuit court under ORS 260.532(4) and ORS 260.993(1). ORS chapter 260 pertains to campaign finance regulation and election offenses.[8]

Plaintiffs are not claiming violations of ORS chapter 260. They only claim violation of ORS 310.315. That statute dictates the question and other conditions for a ballot title of a school district one year operating tax levy. In *Gugler I*, the Supreme Court addressed Tax Court jurisdiction over questions arising under Local Budget Law. The Supreme Court interpreted ORS 294.485, which authorizes the Tax Court to hear challenges to tax levies made contrary to "any other law relating to the making of tax levies." It held that "the correct interpretation limits Tax Court jurisdiction to laws addressed to the procedure and characteristics of tax levies." 305 Or at 553.

■ Plaintiffs claim defendant violated ORS 310.315. That statute is a tax law of the state and addresses the procedure for tax levies. Accordingly, the court finds it has jurisdiction over these claims.

Plaintiffs claim defendant violated that portion of ORS 310.315(2) which states:

"The statement in the ballot title required by this section shall be plainly worded and factual and shall avoid as far as practical the use of technical terms. The statement shall not advocate a yes or no vote on the question."

The summary statement on the ballot title indicated that the proposed levy would provide the following:

"[G]uarantee Baker School District 5-J will receive a maximum amount of state replacement dollars under Ballot Measure 5, and an amount comparable to surrounding school districts,

"to prevent the loss of available state support to our district,

---

[8] During trial, plaintiffs argued that defendant's board committed election offenses. *See* ORS 260.315 *et seq*. The board, at its June 27, 1991, meeting, discussed sending letters of appreciation to levy supporters *from* the political action committee, apparently conducting political action committee business at the board meeting. However, this claim was not raised by the pleadings. Also, this court does not have jurisdiction over such matters because they do not apply to the "procedures and characteristics of tax levies." *Gugler v. Baker County Educ. Serv. Dist. (Gugler I)*, 305 Or 548, 554, 754 P2d 891 (1988).

"provide the required standard programs for the district's more than 2300 students, including replacement of required textbooks, fund handicapped student programs, fund required alternative education and fully implement the talented and gifted program mandated by law."

Plaintiffs claim the use of the word "guarantee" is misleading and that the levy was not necessary to provide defendant "an amount comparable to surrounding school districts."

The ballot title refers to Measure 5, which imposes limits on taxes that can be levied for schools. That measure, now Article XI, section 11b, of the Oregon Constitution, mandates the state replace from its general fund any tax dollars lost by schools due to the property tax limits through the 1995-96 fiscal year. *See* Or Const, Art XI, § 11b(5). Apparently defendant believed that if a school levy was less than the maximum amount allowed by Measure 5 there would be no loss and the state would not provide any replacement revenues. Since the school tax limit imposed by Measure 5 for 1991-92 was $15 per thousand, defendant proposed a levy which, including the education service district levy, would equal $15 per thousand. Defendant apparently viewed 1991-92 as a bench mark year which would have considerable effects on the future replacement dollars to be provided to defendant from the state general fund.

Defendant's evidence showed it waited as long as possible before holding a tax levy election. Defendant was waiting for the 1991 legislature to pass laws clarifying application of Measure 5. The legislature was considering two bills, Senate Bill 814 and Senate Bill 815. Senate Bill 815 was passed and signed by the Governor on May 14, 1991, and became effective that date. Or Laws 1991, ch 162. That law, however, pertained only to the distribution of funds for the 1991-92 fiscal year. As Mr. Holmberg explained, defendant's concern was for years subsequent to 1991-92. Defendant contends that because Senate Bill 814 had not yet passed, the tax levy was necessary to assure receiving state replacement revenues. On the day of the tax levy election, June 25, 1991, Senate Bill 814 was referred back to the Joint Revenue and School Finance Committee. That bill was not signed into law until August 5, 1991.

The court finds the use of the term "guarantee" in the ballot title was not false or misleading. Likewise, the statement "to prevent the loss of available state support to our district" was not false or misleading. Those statements accurately conveyed the notion that under Measure 5 defendant would be assured of receiving state replacement dollars. In the absence of specific legislation, defendant's belief, as to how Measure 5 would impact its future sources of income, was reasonable.

Plaintiffs also claim that the statement that the district had more than "2,300" students was factually false.[9] Defendant contends that it was accurate. The dispute arises because each of the parties uses a different measure.

Plaintiffs use a measure of "average daily membership."[10] This is a measure used by the Oregon Department of Education in its formula for distribution of state funds. The evidence showed that, under this means of measurement, the average daily membership for defendant was 2,168.2 students for the quarter ending March 31, 1991.

Defendant used the number of "enrolled students." Enrollment is a cumulative figure also used by the Oregon Department of Education in its accounting for students. The total enrollment for the quarter ending March 31, 1991, was 2,427. Of the total enrollment, there were 228 withdrawals, leaving 2,236 students.

The court finds the statement was not false or misleading. While average daily membership is a measure used for budgeting purposes, it is a technical and esoteric measure.[11] If that measure were used without additional explanation, the public would not understand. Since the ballot law

_____

[9] Defendant's levy message was that "[c]urrent enrollment is 2,230." While "2,300" was technically false, the court finds a difference of 70 students is not material, particularly since the same levy message predicted a 1992-93 enrollment of greater than 2,300.

[10] " 'Average daily membership' means the aggregate days membership of a school during a certain period divided by the number of days the school was actually in session during the same period. However, if a district school board adopts a class schedule that operates throughout the year for all or any schools in the district, average daily membership shall be computed by the Department of Education so that the resulting average daily membership will not be higher or lower than if the board had not adopted such schedule." ORS 327.006(2).

[11] The court notes that the average daily membership numbers used for the

limits the amount of explanatory words, it would be unreasonable to require the necessary explanation.

On the other hand, enrollment is a common and generally understood concept. While the public may not be aware that defendant was using the cumulative enrollment number, it is not unreasonable and is consistent with state regulations. Students enrolling and then later withdrawing require resources and administration. The purpose of the statement on the ballot was not to reflect some actual budget cost but to give a general indication of the size of the district. It might have been more accurate to say "approximately 2,300 students" but, undoubtedly, the public understands the number of students varies from time to time.

Plaintiffs claim the ballot title is misleading in indicating that the levy was necessary to purchase required textbooks and fund special education programs. Plaintiffs contend federal and state funds provide for special education programs. However, the evidence showed state and federal funds were limited and that "local school districts provide most of the dollars that fund special education in this state."[12]

While plaintiffs recognize special education programs are funded with a mixture of sources, they claim that such programs are "not solely dependent on District 5-J sources." Plaintiffs err. The ballot title does not suggest or imply that special education programs are funded solely from local sources. The ballot title does state that the levy is required to provide standard programs. The evidence showed that if the district had to cut its budget it could affect the special education programs. For example, the talented and gifted program, although mandated by law, is financed 100 percent by local funding. If defendant had to cut its budget, it may not be able to "fully implement" the talented and gifted program.

state basic school support formula were those numbers of students as of June of the year preceding distribution. Or Laws 1989, ch 971, § 11(3).

[12] The record indicates that defendant's special education program incurs costs substantially below the statewide and regional averages and is conservatively financed.

Plaintiffs' basic complaint is defendant does not expend funds in the manner plaintiffs believe it should. The authority or power to determine how defendant's resources should be spent has been delegated to its governing body. That body is elected by the voters and represents them in making its decisions. If that body determines that a tax levy was needed to replace textbooks, and plaintiffs have not shown to the contrary, that statement is accurate and not misleading.

■ Finally, plaintiffs claim the ballot title is not neutral or impartial. Plaintiffs claim the ballot title "inferred" [sic] that if the levy was not passed, students would be deprived of textbooks, training for the handicapped, et cetera. Again, plaintiffs are attacking the determination of defendant's board. If the board decides some needed textbooks will not be purchased and some special educational programs will be less than standard or fully implemented, such decisions are within its authority to make. Plaintiffs are mistaken in believing their disagreement with the board's decisions makes those decisions wrong. To the contrary, they are presumptively correct. If plaintiffs disagree with those decisions, their remedy is to elect new representatives.

Based on the above findings, the court finds the budget and tax levy were prepared and made in substantial compliance with the Local Budget Laws. Judgment will be entered accordingly.

Costs to neither party.